# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
DOLORES BAROT,                )
                              )
                Plaintiff,    )
                              )
        v.                    )      Civil Action No. 13-0451 (ABJ)
                              )
EMBASSY OF THE REPUBLIC OF    )
THE ZAMBIA,                   )
                              )
                Defendant.    )
_____)
```

## MEMORANDUM OPINION

Plaintiff Dolores Barot brought this action against the Embassy of the Republic of Zambia alleging that defendant discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* when it paid her less than male employees, and that it discriminated and retaliated against her in violation of Title VII and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") when it terminated her employment. Compl. [Dkt. # 1] at 4. Plaintiff later amended her complaint to include an allegation that defendant violated the District of Columbia Wage Payment and Collection Law, D.C. Code § 32-1301, *et seq.* ("DCWPCL"), when it failed to pay her wages she was owed after her termination. 1st Am. Compl. [Dkt. # 17-1] ¶¶ 63–65; 2d Am. Compl. [Dkt. # 60] ¶¶ 87–90. On September 8, 2017, the Court granted defendant's cross-motion for partial summary judgment on the DCWPCL count (Count IV), concluding that the claim was barred by the statute of limitations.

Pending before the Court is defendant's motion for summary judgment on Counts I, II, and III. Def.'s Mot. for Summ. J. [Dkt. # 80] ("Def.'s Mot."); Mem. in Supp. of Def.'s Mot. [Dkt. # 80-

1] ("Def.'s Mem.").[1]  While it appears that plaintiff's termination was hasty, and one could take

issue with the quality of the managerial decision making involved, plaintiff has not come forward

with evidence that would enable a reasonable jury to conclude that she was terminated because of

---

1      Plaintiff consented to the entry of summary judgment in favor of defendant on Count I. *See* Pl.'s Opp. to Def.'s Mot. [Dkt. # 86] at 1 n. 1 ("Plaintiff does not oppose Defendant's Motion for Summary Judgment related to [her] pay discrimination claims.").  Therefore, the Court will grant judgment in favor of defendant on plaintiff's pay discrimination claim, and this opinion will only address Counts II and III.
        The Court recognizes that in *Winston & Strawn, LLP v. McLean*, the Court of Appeals held that "[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition."  843 F.3d 503, 505 (D.C. Cir. 2016).  The court underscored that the "District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.'"  *Id.*, quoting *Grimes v. Dist. of Columbia*, 794 F.3d 83, 95 (D.C. Cir. 2015).  However, that ruling arose in the context of a case in which the district court exercised its discretion under the Local Rules to treat a summary judgment motion as conceded when the non-moving party failed to file any opposition at all.  The Court stated:

> A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  And then a district court must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.  These standards cannot be satisfied if, as allowed by Local Rule 7(b), the District Court simply grants judgment "as conceded" when the nonmoving party fails to meet a deadline.

*Id.* at 507 (internal citations, quotation marks, and edits omitted).
        But that is not what happened in this case.  Defendant met its initial responsibility to inform the Court of the basis of its motion, and it pointed to the portions of the record that demonstrate the lack of any genuine issue of material fact on Count I.  And here, unlike in *Winston & Strawn*, plaintiff filed a timely opposition to the motion for summary judgment, and she identified all of the issues which, in her view, presented genuine disputes of material fact that would bar entry of judgment against her.  Thus, plaintiff has availed herself of the opportunity provided in Rule 56(c) to address all of defendant's assertions of fact, and, pursuant to Rule 56(e), the Court may consider the facts related to Count I to be undisputed for purposes of the pending motion.  Since in the face of that showing, plaintiff specifically informed the Court that she did not oppose the entry of judgment against her on Count I, there is no dispute for the Court to adjudicate, and the requirements of Rule 56 have been satisfied.

her age, or in retaliation for complaining about gender discrimination.  So the Court will grant

defendant's motion for summary judgment on the remaining counts.

## BACKGROUND

### I.    Factual Background[2]

Plaintiff began working for defendant as a secretary in January 1998.  Def.'s SOF ¶ 1; Pl.'s

SOF ¶ 1.  Her base salary was $1,300.00 per month, and she was eligible for an annual salary

increase of $600.00 if the Embassy was satisfied with her performance during the year.  Def.'s

SOF ¶ 21; Pl.'s SOF ¶ 21.  As of the time of her termination, plaintiff's monthly salary was

$3,150.00.  Def.'s SOF ¶ 26; Pl.'s SOF ¶ 26.

During her employment, plaintiff's supervisor was either the Embassy's Second Secretary

(Accounts) – originally Paul Mulenga, and then Frank Mbewe – or its First Secretary

(Accounts) – Mbewe.  Def.'s SOF ¶ 2; Pl.'s SOF ¶ 2.  Over time, as plaintiff saw it, she took on

additional duties she described as "accounting duties," Pl.'s SOF ¶ 27; Ex. 3 to Def.'s Mot.

[Dkt. # 80-3] at 7, 16, and, she wrote a memorandum to the Ambassador on September 7, 2009

requesting an increase in her salary.  Def.'s SOF ¶ 27; Pl.'s SOF ¶ 27; Ex. 18 to Def.'s Mot.

---

2        Pursuant to Local Civil Rule 7(h), defendant submitted its statement of undisputed material
facts in support of its motion for summary judgment.  Statement of Undisputed Material Facts in
Supp. of Def.'s Mot. [Dkt. # 80-2] ("Def.'s SOF").  Plaintiff filed a response to defendant's
statement of material facts as part of her brief in opposition to defendant's motion for summary
judgment.  Pl.'s Resp. to Def.'s SOF [Dkt. # 86-1] ("Pl.'s SOF").  Plaintiff also provided an
additional statement of undisputed material facts in opposition to defendant's motion.  Pl.'s
Additional Statement of Undisputed Material Facts in Opp. to Def.'s Mot. [Dkt. # 86-1] ("Pl.'s
Counter SOF") at 12–16.  Defendant then filed a response to plaintiff's additional statement of
undisputed material facts attached to defendant's reply brief.  Def.'s Reply to Pl.'s Counter SOF
[Dkt. # 87-1] ("Def.'s Resp. SOF").  Though plaintiff's additional statement of undisputed material
facts and defendant's response to those facts are not contemplated by Local Civil Rule 7(h) – and
it is unclear why these additional factual statements are provided – they nevertheless identify
additional undisputed facts.  So, when the parties acknowledge that a fact is undisputed in either
set of factual statements, and the record supports those facts, the Court will cite to those statements.

[Dkt. # 80-5] ("Sept. 7 Barot Memo"). She also provided copies of the memorandum to Mbewe; Felix C. Mbula, the First Secretary (Political & Administrative); and the Embassy's Minister Counsellor, Alfred Chioza. *See* Sept. 7 Barot Memo; Ex. 2 to Def.'s Mot. [Dkt. # 80-3] at 104:9–14.[3]

In the memo, plaintiff advocated for a salary increase commensurate with her "extra work load," and she claimed that four other individuals had been treated in that manner. Def.'s SOF ¶ 27; Pl.'s SOF ¶ 27; *see also* Sept. 7 Barot Memo. Plaintiff's memo had this to say about the four others:

> Back in February, 2000, when Glen Jervis, Receptionist took the position of Secretary, her Salary was commensurately increased from $1,260.00 to $1,460.00, a monthly increase of $200.00 ($2,400.00/year).
>
> In May 2003 . . . Office Orderly/Janitor, Cresencio Lawigan's monthly salary was raised from $1,000 to $1,200.00; an increase of $200.00 a month ($2,400.00/year), justifying that he has to do extra work in the Chancery and the Ambassador's Residence.
>
> In 2007, when the Second Secretary (Accts.) and Third Secretary (PA) were promoted to First Secretary (Accts) and Second Secretary (PA), their Overseas Allowances were also commensurately raised.

Sept. 7 Barot Memo; *see also* Def.'s SOF ¶ 28; Pl.'s SOF ¶ 28 (clarifying that Glen Jervis is female and Crescencio Lawigan is male). Plaintiff also maintained that she deserved the increase because the fact that she had created a computer template to substitute for paper forms had saved the Embassy money:

---

3      At times, plaintiff cites to her deposition in support of her rendition of the facts, but she does not provide the Court with the deposition pages to which she refers. She simply cites to the deposition which was attached in full as Exhibit MM to defendant's reply to plaintiff's opposition to its cross-motion for partial summary judgment. *See* Ex. MM to Def.'s Reply to Pl.'s Opp. to Def.'s Cross-Mot. for Partial Summ. J. [Dkt. # 82-1] ("Barot Dep."). Since plaintiff's full deposition transcript is in the record, and because she cites to it throughout her statement of facts and motion, the Court's citations to plaintiff's testimony will refer to the full transcript already in the record.

> I have been doing my job exceedingly, and the Embassy have [*sic*] been saving a lot, which savings is more than the 10% of my one month's salary. These savings are from purchase of Payment Vouchers and Backing Sheets because prior to my hiring, all these forms are bought from Printing Companies which the Embassy is no longer doing from then on.

Sept. 7 Barot Memo.

On September 9, 2009, plaintiff met with Mbewe and Mbula to discuss her requested salary increase. Def.'s SOF ¶ 31; Pl.'s SOF ¶ 31. Plaintiff's request was denied, and Mbewe, Mbula, and plaintiff agreed that she would return to her ordinary secretarial duties instead. *See* Def.'s SOF ¶ 31; Pl.'s SOF ¶ 31; Barot Dep. at 106:12–16; *id.* at 107:19–108:9.

Before she left for the day, though, plaintiff prepared and delivered another memorandum to Mbewe and Mbula. She informed them that there was a shortage of the hard copy payment voucher forms that she would now need in light of her return to "secretary only" duties. Def.'s SOF ¶¶ 32–33; Pl.'s SOF ¶¶ 32–33; *see* Ex. 20 to Def.'s Mot. [Dkt. # 80-5] ("Sept. 9 Barot Memo");[4] Barot Dep. at 122:22–123:6 (explaining that she would go back to using the paper form because that is what she did "when [she] was first hired as being [a] secretary"). Plaintiff had created and then continuously used the computerized version of the form during the time period that led up to the meeting. But after the meeting, she gave a memorandum to her supervisors advising them that they would need to order the paper forms again, repeating her point that she had been saving the Embassy money. *See, e.g.*, Barot Dep. at 115:20–116:6 ("On the 9th after our meeting, it has been agreed that I will be going back to being secretary. So because when I was a secretary I just filled out those forms, the payment vouchers, the backing sheet, and the forms. So – and the payment vouchers that I had was already running out, the forms that I was using before

---

4       Only a draft of this memorandum, written in shorthand, is still in existence. Def.'s SOF ¶ 32; Pl.'s SOF ¶ 32.

when I was a secretary. They still had the form there, so I requested for purchase of those payment vouchers."); *id.* at 123:18–124:3 ("Q. Why did it have to go back to that way instead of you continuing to use the form that was on your computer that would show the numbers on it?" A. "So I just wanted them to know that the one that I did was very useful. They were saving, because I was – I have to point them to they were saving because of what I did. So I had to be compensated for what I did."); *id.* at 156:17–157:17 ("Because I want them to know that that they are saving a lot by using what I have done and what I had formatted in my computer. They are saving a lot."); *see also* Sept. 9 Barot Memo.

According to defendant, Mbewe did not have access to the computerized forms on his computer, but he could access them on plaintiff's computer. Def.'s SOF ¶ 34. He logged on to plaintiff's computer after she left work on September 9, but he was unable to find the form, and he concluded that the payment voucher template had been deleted. *Id.* He then informed Mbula that plaintiff had deleted the template. *Id.* & n.52; *see* Ex. 21 to Def.'s Mot. [Dkt. # 80-5] ("Brief on the Case of Dolores Barot") at 2.[5] The "mission administration" made a decision that night to place plaintiff on administrative leave immediately pending the arrival of the Ambassador. *See* Brief on the Case of Dolores Barot at 2.

The next morning, September 10, 2009, Mbula entered plaintiff's office. Def.'s SOF ¶ 36; Pl.'s SOF ¶ 36. After he asked plaintiff whether she was a member of a labor union, to which she responded "no," he presented her with a letter dated the same day signed by Chioza, placing her

---

5    Plaintiff disputes the allegation that she deleted the payment voucher template. She claims that she used the template on September 10, 2009 to prepare a payment voucher for the representational car of the Ambassador, Pl.'s SOF ¶ 34; Barot Dep. at 112:19–113:3; *id.* at 388:15–389:10, and that the vouchers issued to her after she was placed on administrative leave were created using the computerized voucher template. Pl.'s SOF ¶ 34; Barot Dep. at 310:22–312:17. Plaintiff did not supply any documentary evidence on this point.

on indefinite administrative leave. Def.'s SOF ¶ 36; Pl.'s SOF ¶ 36. Mbula asked her to gather her things, and he escorted her out of the office. Def.'s SOF ¶ 36; Pl.'s SOF ¶ 36.[6]

The September 10, 2009 letter stated:

> Further to the meeting between First Secretary (Accounts), First Secretary (Political and Administration) and yourself, regarding matters pertaining to your duties, and after serious consideration of the circumstances surrounding your actions thereafter, it has been decided to place you on indefinite administrative leave with immediate effect pending review of your case.
>
> During your administrative leave, you will receive 50% of your salary. Any further decisions regarding your employment with the Embassy will be made after the outcome of the review of your case.

Ex. 22 to Def.'s Mot. [Dkt. # 80-5] ("Administrative Leave Letter").

In a letter dated November 5, 2009, defendant informed plaintiff that she had been terminated. *See* Ex. 24 to Def.'s Mot. [Dkt. # 80-5] ("Termination Letter"). That letter stated in relevant part:

> I write to inform you that following the review of the circumstances that led to your being placed on administrative leave on 10th September, 2009, the Embassy has decided that your services are no longer required by the Government of the Republic of Zambia.
>
> Your employment contract has therefore been terminated with effect from 31st October 2009. You will be paid one month's salary in lieu of notice.

*Id.* Plaintiff was 62 years old when she was terminated, and she was the oldest locally engaged staff member employed at the Embassy. Def.'s SOF ¶ 4; *see* Pl.'s SOF ¶ 4. On approximately November 23, 2009, the Embassy hired Nischel Pedapudi, a male who was younger than plaintiff, as her replacement. *See* Def.'s SOF ¶ 46; Pl.'s SOF ¶ 46.

---

6      At some point during this exchange, Mbewe entered plaintiff's office as well. Def.'s SOF ¶ 36; Pl.'s SOF ¶ 36.

## II.    Embassy Personnel

The organization of the Embassy is relevant to its status as an employer that could be liable under Title VII and the ADEA.  The Ambassador, the Defense Attaché, and Embassy personnel, which includes both diplomatic personnel and locally engaged staff, were posted to the Embassy located in Washington, D.C.  *See* Def.'s SOF ¶¶ 6, 11; Pl.'s SOF ¶¶ 6, 11.

During the relevant time period prior to plaintiff's termination, the Embassy had no more than fourteen locally engaged staff, the Defense Attaché had two locally engaged staff, Def.'s SOF ¶ 6; Pl.'s SOF ¶ 6, and there were ten diplomatic personnel (including the Defense Attaché) posted to the Embassy in Washington, D.C.  Def.'s SOF ¶ 11; Pl.'s SOF ¶ 11.[7]

The diplomatic personnel, except for the Defense Attaché were hired, fired, and disciplined by Zambia's Ministry or Minster of Foreign Affairs, and their work assignments were assigned and monitored by the Minister of Foreign Affairs as well.  Def.'s SOF ¶¶ 12–13; Pl.'s SOF ¶¶ 12–13.  Diplomatic personnel were paid out of a budget established by the Minister of Foreign Affairs, and the Minister set their salaries, specified their methods of work, and regulated payroll practices.  Def.'s SOF ¶¶ 13–14; Pl.'s SOF ¶¶ 13–14.

Members of the Embassy's locally engaged staff were hired and fired by the Ambassador.  Def.'s SOF ¶ 7; Pl.'s SOF ¶ 7.  The diplomatic heads of departments exercised day-to-day supervision over the staff:  promulgating work rules, maintaining employment records, distributing

---

[7]    The Republic of Zambia maintains a permanent mission to the United Nations in New York City ("UN Mission").  Def.'s SOF ¶ 15; Pl.'s SOF ¶ 15.  Zambia's Minister of Foreign Affairs has the authority to hire and fire diplomatic personnel assigned to the UN Mission, and also sets the conditions of their employment, monitors their performance, sets their salaries, and disciplines them.  Def.'s SOF ¶¶ 15–16; Pl.'s SOF ¶¶ 15–16.  The UN Mission's locally engaged staff is hired, fired, and disciplined by the diplomatic head of the UN Mission – the Permanent Representative.  Def.'s SOF ¶¶ 15, 17; Pl.'s SOF ¶¶ 15, 17.  The UN Mission exercises control over locally engaged staff's work, and sets their salaries with recommendation from Zambia's Minister of Foreign Affairs.  Def.'s SOF ¶ 17; Pl.'s SOF ¶ 17.

work assignments, and handling disciplinary matters. Def.'s SOF ¶ 8; Pl.'s SOF ¶ 8. The diplomat generally in charge of locally engaged staff was the First Secretary (Administration). Def.'s SOF ¶ 8; Pl.'s SOF ¶ 8.

The Embassy proposed terms of employment for its locally engaged staff, and it exercised authority over support staff personnel matters. Def.'s SOF ¶ 9; *see* Pl.'s SOF ¶ 9.[8] But staff salary had to be approved by Zambia's Minister of Foreign Affairs. Def.'s SOF ¶ 9; *see* Pl.'s SOF ¶ 9.

The Defense Attaché was hired, disciplined, and fired by Zambia's Ministry of Defense. Def.'s SOF ¶¶ 12–14; Pl.'s SOF ¶¶ 12–14. The Ministry of Defense assigned and oversaw the work performed by the Defense Attaché. Def.'s SOF ¶¶ 12–14; Pl.'s SOF ¶¶ 12–14. Within the office of the Defense Attaché, the Defense Attaché had authority – with notice to the Minister of Defense – to hire and fire his own locally engaged staff, which consisted of a driver and a secretary. Def.'s SOF ¶ 10; *see* Pl.'s SOF ¶ 10. The Defense Attaché also controlled his locally engaged staff members' work assignments and employment records, monitored their performance, disciplined them, and, in conjunction with the Minister of Defense, set their salaries. Def.'s SOF ¶ 10; *see* Pl.'s SOF ¶ 10. The Defense Attaché's locally engaged staff was paid out of the Defense Attaché's budget, Def.'s SOF ¶ 10; *see* Pl.'s SOF ¶ 10, and the Defense Attaché's compensation and conditions of service were governed by rules established by the Ministry of Foreign Affairs. Def.'s SOF ¶ 14; Pl.'s SOF ¶ 14.

---

8       Plaintiff "disputes" this fact "to the extent that it asserts a legal conclusion about the locally engaged staff's statutory employer for the purpose of the ADEA or Title VII." Pl.'s SOF ¶ 9. Local Rule 7(h) requires a party's separate statement of genuine facts to set "forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h). Plaintiff has failed to do so here, and instead, only provides her own commentary. To the extent plaintiff does not support her factual assertions with record evidence, the Court can neither credit them, nor conclude that they controvert defendant's factual assertions.

The Embassy's locally engaged staff, including plaintiff, could be called upon to assist the Defense Attaché with tasks such as typing memoranda and checks. Def.'s SOF ¶ 10; *see* Pl.'s SOF ¶ 10.

### III. Procedural Background

On June 20, 2010, plaintiff filed a charge of sex and age discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Pl.'s Counter SOF ¶ 26; Def.'s Resp. SOF ¶ 26; *see* Ex. 26 to Pl.'s Opp. [Dkt. # 86-2]. The EEOC issued a decision on September 28, 2012, concluding that there was reasonable cause to believe that the Embassy discriminated against plaintiff based on her sex and her age when it discharged her, in violation of Title VII and the ADEA, and that it retaliated against her in violation of the ADEA. Pl.'s Counter SOF ¶ 29; Def.'s Resp. SOF ¶ 29; *see* Ex. 27 to Pl.'s Opp. [Dkt. # 86-3] ("EEOC Determination"). However, the EEOC concluded that there was insufficient evidence to establish that the Embassy retaliated against plaintiff in violation of Title VII. *See* EEOC Determination.

On March 18, 2013,[9] plaintiff filed her initial complaint, alleging violations of Title VII and the ADEA. Compl. Plaintiff filed her first amended complaint on November 22, 2013, in which she added a DCWPCL claim. *See* 1st Am. Compl. ¶¶ 63–65.

On April 11, 2014, the Court dismissed plaintiff's amended complaint for lack of personal jurisdiction based on plaintiff's failure to perfect service on defendant in accordance with the Foreign Sovereign Immunities Act ("FSIA"). *Barot v. Embassy of the Republic of Zambia*, 11 F. Supp. 3d 24, 32 (D.D.C. 2014). The Court denied plaintiff's motion for reconsideration on June 2, 2014. *Barot v. Embassy of the Republic of Zambia*, 11 F. Supp. 3d 33, 36 (D.D.C. 2014).

---

9     The parties dispute the date on which plaintiff filed her original complaint, *see Barot v. Embassy of Zambia*, 264 F. Supp. 3d 280, 285 n.5 (D.D.C. 2017), but this date does not affect the outcome of this case so the Court need not address the issue.

Plaintiff appealed the dismissal of her amended complaint, and the Court of Appeals reversed and remanded the case to "afford [plaintiff] . . . the opportunity to effect service pursuant to 28 U.S.C § 1608(a)(3)." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 29–30 (D.C. Cir. 2015); *see also* Mandate of United States Court of Appeals [Dkt. # 41].

After plaintiff perfected service, *see* Return of Service Aff. [Dkt. # 52], defendant moved to dismiss the amended complaint on the grounds that it failed to state a claim upon which relief could be granted. Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss [Dkt. # 53-1]. In response, plaintiff filed a motion for leave to file a second amended complaint pursuant to Federal Rule of Civil Procedure 15, Mot. for Leave to File 2d Am. Compl. [Dkt. # 54], which the Court granted. Min. Order (Jan. 19, 2016).

Plaintiff filed a second amended complaint on January 19, 2016. 2d Am. Compl. [Dkt. # 60]. Count I alleges pay discrimination on the basis of gender in violation of Title VII. *Id.* ¶¶ 69–75. Count II alleges that plaintiff was terminated because of her age in violation of the ADEA. *Id.* ¶¶ 76–80. Count III alleges that she was retaliated against in violation of Title VII for making complaints to her employer regarding unequal pay and discrimination. *Id.* ¶¶ 81–86. Count IV alleges that defendant failed to pay plaintiff her owed wages in violation of the D.C. Wage Payment and Collection Law. *Id.* ¶¶ 87–90. On February 12, 2016, defendant filed an answer, which included a counterclaim for trespass to chattel against plaintiff. Answer [Dkt # 62] ¶¶ 103–08. Defendant voluntarily dismissed the counterclaim on February 26, 2016, Notice of Voluntary Dismissal [Dkt. # 64] after filing an amended answer on February 25, 2016. Am. Answer [Dkt. # 63].

Following discovery, plaintiff moved for partial summary judgment on her DCWPCL claim, Mot. for Partial Summ. J. [Dkt. # 75], and defendant filed a cross-motion for summary

judgment on the same count. Def.'s Cross-Mot. for Partial Summ. J. [Dkt. # 78]. The Court granted defendant's cross-motion for summary judgment. *See Barot*, 264 F. Supp. 3d at 287. Defendant also filed a motion for summary judgment on Counts I, II, and III on March 9, 2017. Def.'s Mot. The motion has been fully briefed.[10]

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment

---

10    Plaintiff filed her opposition to defendant's motion for summary judgment on April 10, 2017. Pl.'s Opp. to Def.'s Mot. [Dkt. # 86] ("Pl.'s Opp."). On April 24, 2017, defendant filed its reply. Def.'s Reply to Pl.'s Opp. [Dkt. # 87] ("Def.'s Reply").

motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

I.      **A dispute of fact exists as to whether the Embassy is an "employer" for purposes of Title VII and the ADEA.**

Title VII applies to any employer who "has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). Under the ADEA, the definition of an "employer" is identical, except that the person or entity must have "twenty or more employees." 29 U.S.C. § 630(b).[11]

"[T]he threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006). The Embassy argues that it is not an employer for purposes of Title VII or the ADEA because it employed fewer than fifteen people (or twenty under the ADEA), *see* Def.'s Mem. at 13–19, and it seeks the entry of judgment in its favor on that basis.

The parties do not dispute that during the relevant time period, the Embassy had no more than fourteen locally engaged staff. Def.'s SOF ¶ 6; Pl.'s SOF ¶ 6. But plaintiff contends that the ten diplomatic personnel posted to the Embassy, as well as the Defense Attaché's two locally engaged staff, should be counted as Embassy employees for the purpose of determining whether the Embassy is subject to the requirements of Title VII and the ADEA. *See* Pl.'s Opp. at 5. This legal conclusion turns upon the application of legal principles to disputed facts, and the Court cannot grant summary judgment on this issue.

---

11      Both statutes define an "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f); 29 U.S.C § 630(f).

**A.    The Embassy does not meet the employee requirement under the payroll method.**

The Supreme Court addressed the question of how to determine whether "an employer 'has' an employee on any working day" for the purpose of Title VII, and it determined that the relevant inquiry is whether "the employer has an employment relationship with the individual on the day in question." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206 (1997). "This test is generally called the 'payroll method,' since the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll." *Id.*; *see id.* at 207 (observing that the payroll method has also been adopted by the EEOC under the ADEA). But, the Court also noted that "an individual who appears on the payroll but is not an 'employee' under traditional principles of agency law, would not count toward the 15-employee minimum." *Id.* at 211 (internal citation omitted).

Here, neither party has pointed the Court to Embassy payroll records for use in applying the "payroll method." The Embassy did supply a document specifying the monthly wages paid to the fourteen members of its locally engaged staff, *see* Ex. 9 to Def.'s Mot. [Dkt. # 80-4], and plaintiff does not dispute that the Embassy employed the fourteen people, but nothing in the document establishes which entity actually paid the staff. But even if those fourteen are counted, plaintiff has not come forward with any evidence that the other workers – the ten diplomats and two Defense Attaché staff members – were also on the Embassy's payroll.

Plaintiff does not dispute that the Defense Attaché had the authority to set its locally engaged staff's salaries, and that his two staff members were "paid from the Defense Attaché's budget." Def.'s SOF ¶ 10; *see* Pl.'s SOF ¶ 10. And plaintiff does not dispute that Zambia's Minister of Foreign Affairs had the authority to set the salaries of the ten diplomats, and that they were "paid from a budget set by Zambia's Minister of Foreign Affairs." Def.'s SOF ¶¶ 13–14;

Pl.'s SOF ¶¶ 13–14.  Since plaintiff has not rebutted these facts with any evidence demonstrating that the staff members or diplomatic personnel were on the Embassy's payroll, the Court concludes that these individuals cannot be considered employees of the Embassy for purposes of meeting the fifteen or twenty person statutory requirement under the payroll method.

**B.    The Embassy does not meet the employee requirement under general agency principles.**

An individual's appearance on the employer's payroll is only one tool courts may use to determine if an employment relationship exists.  Courts are also generally guided by the principles of agency law.  *See Walters*, 519 U.S. at 211–12; *see also Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979) (directing courts to apply general principles of agency law when analyzing if an individual is an employee or independent contractor under Title VII).  The most important factor to review is "the extent of the employer's right to control the 'means and manner' of the worker's performance."  *Spirides*, 613 F.2d at 831.  Plaintiff fares no better under this test.

Under the "control test" as plaintiff calls it, plaintiff argues that the diplomatic personnel and the Defense Attaché's locally engaged staff should be counted as Embassy employees because they "controlled the essential elements of [her] employment."  *See* Pl.'s Opp. at 5.  But the question is not who controlled plaintiff's work; to establish that others working at the Embassy were employees of the Embassy, plaintiff must show who controlled *their* work.  Since there is no evidence that the Embassy exercised any control over the diplomatic personnel or Defense Attaché's staff, it cannot be considered to be their employer under agency principles either.

**C.    There is a genuine issue of material fact on the question of whether the Embassy and the Ministry of Foreign Affairs can be considered plaintiff's "single employer" for purposes of the statutory employee requirement under Title VII and the ADEA.**

Plaintiff also argues that the Embassy meets the employee requirement under Title VII and the ADEA based on two other theories:  first, that the Ministry of Foreign Affairs and the Embassy

are an integrated enterprise, or a "single employer," so the Ministry's employees should be aggregated with the Embassy's locally engaged staff for purposes of the statutory requirement; and second, that the Ministry of Foreign Affairs and the Office of the Defense Attaché, through their diplomatic personnel and staff, controlled plaintiff's employment, so she should be deemed "jointly employed" by all three entities, and their employees should be aggregated for purposes of the statutory calculation. *See* Pl.'s Opp. at 5–6. Since plaintiff's showing on the "single employer" theory is enough to preclude summary judgment in favor of defendant on this issue, the Court need not address the alternative theory at this time.

To determine whether two separate entities can be considered a "single employer," courts examine four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations and personnel, and (4) common ownership and financial control. *See Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997) (utilizing the four-part test as originally described under the National Labor Relations Act in the context of the Americans with Disabilities Act); *Allen v. McEntee*, Nos. 92-0776, 92-2151, 1993 WL 121513, at *7 (D.D.C. Apr. 5, 1993) (applying the integrated enterprise test in the context of Title VII and the ADEA for purposes of aggregating employees to meet statutory definition), *aff'd*, 44 F.3d 1031 (D.C. Cir. 1994); *see also Dean v. Am. Fed'n of Gov't Emps.*, *Local 476*, 509 F. Supp. 2d 39, 56 (D.D.C. 2007) (concluding local union did not meet Title VII's employee requirement because the local and national union's operations were not sufficiently interrelated to aggregate number of employees); *Brug v. Nat'l Coal. for Homeless*, 45 F. Supp. 2d 33, 39 (D.D.C. 1999) (declining to aggregate employees, but recognizing that it is necessary "[i]n order to ensure that employers do not circumvent the strictures of Title VII through clever legal maneuvering").

While the Court must take all the circumstances of the case into consideration, *see Local No. 627, Int'l Union of Operating Eng'rs, AFL-CIO v. NLRB*, 518 F.2d 1040, 1045–46 (D.C. Cir. 1975) *rev'd on other grounds*, 425 U.S. 800 (1976), not all four factors must be satisfied for the Court to find a "single employer" under the test. *Id.*; *see also RC Aluminum Indus., Inc. v. NLRB*, 326 F.3d 235, 239 (D.C. Cir. 2003). Ultimately, the single employer test is characterized by the absence of an "arm's length relationship found among the integrated companies" or organizations. *Local No. 627*, 518 F.2d at 1046.[12]

Plaintiff has presented enough evidence to create a genuine issue of material fact on the question of whether the Embassy and the Ministry of Foreign Affairs can be considered plaintiff's "single employer," and therefore the issue of whether the Embassy meets the statutory employee requirement under Title VII and the ADEA cannot be decided as a matter of law.

### 1.    Interrelation of Operations

When considering the first factor of the four part test, interrelation of operations, the NLRB looks to see whether the following seven functions are combined as indicia of interrelatedness: (1) accounting records; (2) bank accounts; (3) lines of credit; (4) payroll preparation; (5) switchboards;

---

12    Defendant questions whether the "integrated enterprise" test should apply to this case where the entities to be integrated are governmental bodies. *See* Def.'s Mem. at 16 n.3; Def.'s Reply at 6. While the "single employer" test was initially developed to determine if private corporations met the statutory employee requirement, courts have applied the test in cases involving governmental entities. *See Tewelde v. Alrbight*, 89 F. Supp. 2d 12, 16 n.7 (D.D.C. 2000) (applying the test to the United States State Department and the American Embassy Association, but concluding that the entities were not a single employer). Even courts that have questioned the test's applicability to governmental entities have observed that at least two of its factors, the "interrelation of operations and centralized control of labor relations," are relevant to the inquiry. *See Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1345–46 (11th Cir. 1999) (holding that the four factor test does not apply perfectly in the context of state or local governmental entities, and holding that courts should "begin with the presumption that governmental subdivisions denominated as separate and distinct under state law should not be aggregated for purposes of Title VII").

(6) telephone numbers; or (7) offices. *Tewelde*, 89 F. Supp. 2d at 17; *see W. Union Corp.*, 224 N.L.R.B. 274, 277 (1976). Plaintiff has not provided the Court with much evidence of commonality between the Embassy and Ministry of Foreign Affairs.

Plaintiff argues instead that the two entities are interrelated because the "work of the locally engaged staff 'employed' by [d]efendant and the diplomatic personnel 'employed' by the Ministry of Foreign Affairs have interrelated operations." Pl.'s Opp. at 6. She also asserts in her opposition that they all "work out of the same location." *Id.* While plaintiff does not point to anything in the record that would verify this contention, it is undisputed that the diplomatic personnel and locally engaged staff were "posted" to the same Embassy located in Washington, D.C. Def.'s SOF ¶¶ 6, 11; Pl.'s SOF ¶¶ 6, 11. But plaintiff's other argument is conclusory and not supported by any evidence in the record.

The Court notes that Mbewe testified that "the embassy is . . . a unit under the ministry of foreign affairs," Ex. 11 to Def.'s Mot. [Dkt. # 80-5] at 25:20– 27:7,[13] and it is undisputed that the Ministry had a role in setting the salaries and conditions of employment of the locally engaged staff as well as the diplomatic personnel. *See* Def.'s SOF ¶¶ 9, 13; Pl.'s SOF ¶¶ 9, 13. Thus, to the extent plaintiff has presented evidence of interrelated operations, it is very weak.

## 2. Common Management

There is no evidence of common management between the Embassy and the Ministry of Foreign Affairs. While the Ministry is part of Zambia's government, *see* Mbewe Dep. at 25:20– 26:1 plaintiff does not provide the Court with any information about who runs the Ministry, let

---

13 The parties cite to various portions of Mbewe's deposition. *See* Ex. 11 to Def.'s Mot. [Dkt. # 80-5]; Ex. 19 to Def.'s Mot. [Dkt. # 80-5]; Ex. 27 to Def.'s Reply [Dkt. # 87-2]; Ex. 29 to Pl.'s Opp. [Dkt. # 86-5] (together, "Mbewe Dep."). The Court's citation to Mbewe's testimony encompasses all of the portions of the transcript cited by the parties.

alone whether any of those individuals have their hands in the Embassy's affairs. Nor does she proffer any evidence concerning the management structure at the Embassy. Although the parties do not dispute that both the Ambassador and the diplomatic heads of departments had some control over the Embassy's locally engaged staff, Def.'s SOF ¶¶ 7–8; Pl.'s SOF ¶¶ 7–8, the Court has been told nothing about how the Embassy itself was managed on a daily basis.

Thus, plaintiff has not pointed to evidence in the record that would rebut defendant's contention that the Ministry was not involved in the management of Embassy affairs and that "locally engaged staff were to be managed exclusively by each mission." *See* Def.'s Mem. at 17; Def.'s Reply at 5.[14]

### 3. Common Ownership and Financial Control

There is very little evidence in the record with regard to the common ownership or financial control of the Embassy by the Ministry of Foreign Affairs. While the Embassy is a unit under the Ministry of Foreign Affairs, it is unclear whether the relationship is a financial one or how the Embassy is funded. Plaintiff has not pointed the Court to any evidence to demonstrate that the entities are financially interrelated other than the undisputed fact that the salaries of the locally engaged staff had to be approved by the Minister of Foreign Affairs. *See* Def.'s SOF ¶ 9; Pl.'s SOF ¶ 9.

### 4. Centralized Control of Labor Relations and Personnel

This brings the Court to the most critical factor – the centralized control of labor relations and personnel – which is accorded the greatest weight. *See Sears v. Magnolia Plumbing, Inc.*, 778 F. Supp. 2d 80, 84 (D.D.C. 2011); *Woodland v. Viacom, Inc.*, 569 F. Supp. 2d 83, 88 (D.D.C.

14      It is the Court's understanding that any reference to the "Mission" is another name for the Embassy in Washington, D.C. *See* Ex. 12 to Def.'s Mot. [Dkt. # 80-5]. ("I refer to a letter that I have received from one of your support staff at that Mission, Ms. Dolores Barot.").

2008). The amount of control required to meet the test of centralized control is "actual and active control of day-to-day labor practices." *Tewelde*, 89 F. Supp. 2d at 18, citing *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 727 (N.D. Ala. 1981); *Woodland*, 569 F. Supp. 2d at 88.

It is undisputed that "[c]onditions of employment of locally engaged staff, such as salary, were proposed by the Embassy and approved by Zambia's Minister of Foreign Affairs." Def.'s SOF ¶ 9; Pl.'s SOF ¶ 9. Moreover, the diplomatic personnel posted to the Embassy on behalf of the Ministry of Foreign Affairs had the authority to hire, fire, and discipline locally engaged staff, and the diplomatic heads of departments gave the staff members work assignments and exercised daily supervision over their work. Def.'s SOF ¶¶ 7–8; Pl.'s SOF ¶¶ 7–8; *see Twelede*, 89 F. Supp. at 18 (finding that there was no evidence of centralized control of labor relations where the State Department did not hire, fire, set wages, working hours, working conditions, or benefits). And plaintiff could not receive her paycheck until it was signed by Mbewe. *See* Barot Dep. at 20:17–21:7.

Defendant argues that the Ministry had no role in Embassy personnel matters, and it points to a letter sent from a Director at the Ministry to the Ambassador to the U.S., stating that personnel matters should be addressed at the individual mission level. Ex. 12 to Def.'s Mot. [Dkt. # 80-5] ("Finally, support staff in Missions abroad should not be encouraged to write to this Ministry over personnel matters which can and should be addressed by respective Missions who are their employers."); *see* Def.'s Mem. at 17; Def.'s Reply at 5. However, defendant fails to mention that in the remainder of the letter, the Director goes on to advise the Ambassador on how to deal with the employee inquiry being discussed. Ex. 12 to Def.'s Mot. [Dkt. # 80-5]. The Director also encourages the Embassy to "ensure that the general conditions of employment for all the Local Staff are standardized." *Id.* So the letter supports more than one inference.

More important, while these factual circumstances relate to control over employees in general, the "focal point of the Court's inquiry . . . is the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Tewelde*, 89 F. Supp. at 19 (internal quotation marks omitted). Defendant maintains that the Ministry of Foreign Affairs "was in no way involved in the adverse employment decisions" in this case. Def.'s Reply at 5. But it is undisputed that Mbewe, Mbula, Minister Chioza, and the Ambassador – all of whom were characterized by defendant as employees of the Ministry, and not the Embassy – *see* Def.'s Mem. at 17–18, were involved in plaintiff's placement on administrative leave and her ultimate termination. *See* Def.'s SOF ¶¶ 35–37; Pl.'s SOF ¶¶ 35–37.

So, although there is no evidence that anyone located in the Ministry of Foreign Affairs in Zambia had any role in the adverse employment actions at issue in this case, the diplomatic personnel who worked on behalf of the Ministry in Washington, D.C. were directly involved in the actions being challenged in this case. Indeed, defendant acknowledges in its supplemental brief that the diplomats "manage the locally engaged staff in Washington, D.C.," and that "for that limited task, they wear a different 'hat' and act in their capacity as *employer and manager* of the clerical and administrative personnel." Suppl. Mem. in Resp. to Ct.'s Order [Dkt. # 91] ("Def.'s Suppl. Mem.") at 5. This is enough to create a genuine issue of material fact on the question of whether the Ministry exercises controls over Embassy personnel matters.

The Court recognizes that the "single employer" four-factor test may not perfectly capture the integration of two governmental entities. But, since the last factor addressed by the Court is generally considered the most important, the Court finds that there is enough evidence to create a genuine issue of material fact as to whether the Ministry of Foreign Affairs is an integrated enterprise or a "single employer" for purposes of Title VII and the ADEA. If that factual question

were resolved in plaintiff's favor, at least nine diplomats[15] posted to the Embassy would be included in the total number of Embassy employees for purposes of meeting the statutory requirement.[16] Therefore, the Court will not grant summary judgment to defendant on this basis, and it must address the merits of plaintiff's claims.

---

15    The Court only mentions nine diplomats since it will not include the Defense Attaché in this calculation.  Since plaintiff would meet the statutory calculation of fifteen or twenty employees regardless of the inclusion of the Defense Attaché in the total, the Court need not decide his legal employer at this time.

16    One court in this district has held that aggregation is not proper under the "single employer" test if one of the two entities would not qualify as an "employer" under the statutory definition. *See Brug*, 45 F. Supp. 2d at 39–40 (concluding that because the United States is expressly excluded as an "employer" under Title VII, federal employees could not be aggregated with private employees to meet the fifteen-person requirement).  The Court asked the parties to provide supplemental briefing on the question of whether the Ministry of Foreign Affairs could qualify as an "employer" for purposes of Title VII and/or the ADEA and whether its diplomatic personnel could be aggregated with Embassy employees. *See* Min. Order (Dec. 20, 2017).
      Nothing in either statute expressly excludes the government of any foreign state or agency from coverage. *See* 42 U.S.C. § 2000e(b); 29 U.S.C. § 630(b).  So this case is distinguishable from *Brug*.  And while defendant misguidedly focuses on how the statutes do not cover discrimination *abroad* unless a foreign employer is controlled by a U.S. employer, plaintiff's case only deals with alleged discriminatory and retaliatory actions that took place in the United States. *See* Def.'s Suppl. Mem. at 2–3; Pl.'s Resp. to Dec. 20, 2017 Order [Dkt. # 92] ("Pl.'s Suppl. Mem.") at 2–3.  And Title VII and the ADEA apply to foreign employers doing business in the United States. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) ("Title VII applies to foreign companies operating in the United States and protects aliens working in the United States as well as U.S. citizens."); *see also Morelli v. Cedel*, 141 F.3d 39, 43–44 (2d Cir. 1998) (concluding that the ADEA covers a U.S.-based branch of a foreign employer); *Jouanny v. Embassy of France*, No. 16-cv-00135, 2017 WL 2455023, at *4–5 (D.D.C. June 5, 2017) (discussing *Morelli* approvingly, and concluding that a foreign embassy operating in the United States was subject to the ADEA).

## II.    The Court will grant defendant's motion on plaintiff's ADEA claim.

Plaintiff alleges that the Embassy discriminated against her on the basis of her age in violation of the ADEA.  The ADEA protects "individuals who are at least 40 years of age."  29 U.S.C. § 631(a).  It provides:

> It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual

---

Further, defendant repeatedly characterizes the diplomats as "Ministry employees."  *See, e.g.*, Def.'s Mem. at 17 ("Diplomats are employees of the Ministry of Foreign Affairs . . . ."); Def.'s Reply at 4; Def.'s Suppl. Mem. at 4.  And even if the diplomats would not be covered by Title VII and/or the ADEA, and they could not sue the Ministry under either statute because the Ministry would be immune from their suit under the FSIA, *see El-Hadad v. United Arab Emirates*, 496 F.3d 658, 662–69 (D.C. Cir. 2007), that does not disqualify them from being aggregated with Embassy employees for purposes of the Embassy meeting the statutory requirements.  Indeed, courts have rejected the argument that "an unprotected employee should not be counted" for purposes of meeting the statutory employee requirement.  *See, e.g.*, *Morelli*, 141 F.3d at 44–45 ("There is no requirement that an employee be protected by the ADEA to be counted . . . .  The nose count of employees relates to the scale of the employer rather than to the extent of the protection.");  *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 816 (9th Cir. 2002) (holding that Title VII's definition of "employee" does not prohibit counting foreign employees); *see also Sinclair v. De Jay Corp.*, 170 F.3d 1045, 1048 (11th Cir. 1999) (approving of *Morelli*'s decision to aggregate employees of foreign employers who work in the United States and a foreign country).

Moreover, the Court agrees with plaintiff that she may proceed with her claims against the Embassy even though she did not sue the Ministry of Foreign Affairs.  Defendant argues that "the joint employer and integrated enterprise theories seek to impose liability on the alleged joint/integrated employer," which the Court cannot do "if the Ministry is not before the Court as a defendant."  Def.'s Suppl. Mem. at 4.  While defendant is correct that the Court cannot impose liability upon the Ministry, plaintiff is not seeking that form of relief.  *See generally* 2d. Am. Compl.; Pl.'s Suppl. Mem. at 7 n.5.  Rather, she is only utilizing the integrated enterprise doctrine or joint employer theory for purposes of establishing liability against the Embassy.  And defendant has not provided the Court with any legal authority suggesting that this is an incorrect use of either doctrine.  In fact, the Court has identified cases in this district that have utilized these theories despite the plaintiff only suing one of the alleged employers.  *See, e.g.*, *Dean*, 509 F. Supp. 2d at 56–57 (although plaintiff only sued the local union, rather than the local and national unions together, the Court utilized the integrated enterprise test to determine if the local union met Title VII's employee requirement); *Woodland*, 569 F. Supp. 2d at 87 (utilizing integrated enterprise doctrine to determine liability of parent company, which was the only entity sued, for acts of its subsidiary); *Tewelde*, 89 F. Supp. 2d at 17 (using the integrated enterprise test to determine if the U.S. State Department, which was the only party sued, was liable under Title VII for acts committed by plaintiff's employer, the American Embassy Association).

with respect to his compensation, terms, conditions, or privileges of employment, *because* of such individual's age.

§ 623(a)(1) (emphasis added).  In light of the language of the statute, a plaintiff bringing a disparate treatment claim under the ADEA "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009); *see also DeJesus v. WP Co.*, 841 F.3d 527, 532 (D.C. Cir. 2016).

In the absence of direct evidence of discrimination, which is the  case here, ADEA claims are analyzed under the three-step burden-shifting framework applicable to claims brought under Title VII that was announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (applying the *McDonnell Douglas* framework to ADEA claim since neither party disputed its application).  Under that formulation, a plaintiff must first make out a *prima facie* case by showing that she "(i) belongs to the protected age group, (ii) was qualified for the position, (iii) was terminated and (iv) was replaced by a younger person." *Paquin*, 119 F.3d at 26.  If the plaintiff succeeds, *McDonnell Douglas* then shifts the burden to the defendant employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action.  *Id.*, citing *McDonnell Douglas*, 411 U.S. at 802.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves*, 530 U.S. at 142, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  If the defendant comes forward with a reason, then the plaintiff must produce evidence showing that the defendant's proffered explanation is merely a pretext for discrimination.  *Paquin*, 119 F.3d at 26, citing *McDonnell Douglas*, 411 U.S. at 804.

However, at the summary judgment stage, where an employee "has suffered an adverse employment action and an employer has asserted a legitimate, nondiscriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, the "operative question" is whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Id.* The Court must then examine the totality of the evidence, including "(1) plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer . . . ." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

Here, defendant has offered legitimate, non-discriminatory grounds for its decision to place plaintiff on administrative leave and ultimately fire her. It asserts that plaintiff displayed a bad attitude towards her work and refused to perform her "secretarial duties" after her request for a raise was turned down, and it points to plaintiff's memorandum admonishing the Embassy to purchase new stocks of hard-copy payment voucher and backing sheet forms. *See* Def.'s Mem. at 22–23; Brief on the Case of Dolores Barot at 2–3; Mbewe Dep. at 29:14–30:3. Defendant also maintains that plaintiff deleted the payment voucher template from her computer. *See* Def.'s Mem. at 23; Brief on the Case of Dolores Barot at 2; Mbewe Dep. at 30:4–31:15. This combined rationale shifts the burden back to plaintiff to demonstrate, based on all of the evidence in the record, that the Embassy's asserted reason was not the actual reason for the adverse action, and that defendant

intentionally discriminated against her on the basis of her age. *See Brady*, 520 F.3d at 494 (citations omitted).

### A. Plaintiff made out a prima facie case to shift the burden to defendant under the *McDonnell Douglas* test.

The elements of a prima facie case were established: first, there is no dispute that plaintiff is a member of a protected class and that she was terminated from her job. *See* Def.'s SOF ¶¶ 4, 42; Pl.'s SOF ¶¶ 4, 42; *see* Def.'s Mem. at 22; Pl.'s Opp. at 7. Second, plaintiff's eleven-year tenure at the Embassy and her receipt of regular pay increases – which she could earn only if her performance was satisfactory to her employer – show that she was qualified for her position. *See Paquin*, 119 F.3d at 27 ("[W]e believe that [plaintiff's] twenty-year tenure at Fannie Mae and his series of promotions within the Department suffice to show that he was qualified for his position."); *see also* Def.'s SOF ¶ 21; Pl.'s SOF ¶ 21. And, the parties do not dispute that plaintiff was replaced by someone younger than she was, although there is a dearth of specifics in the record. *See* Def.'s SOF ¶ 46; Pl.'s SOF ¶ 46. No employment records for the replacement have been introduced, but plaintiff testified that the replacement was "in the range of 30 to 40." Barot Dep. 308:8–11.

### B. Defendant has come forward with a legitimate, non-discriminatory basis for its actions.

Defendant has come forward with evidence that it terminated plaintiff based on her resentful attitude and her refusal to perform ordinary secretarial duties in the wake of her unsuccessful attempt to get a raise on September 9, and based on her alleged deletion of the computerized forms that evening. Mbewe testified that plaintiff was placed on administrative leave because "she didn't want to do her work . . . after her demand for the [pay] increment," Mbewe Depo. at 39:16–40:6, and that she was "asking for special treatment for conditions that is supposed to be standard for everyone." *Id.* at 40:22–41:18. He attributed the decision to the way she was "conducting herself," in that she was "refusing to do . . . assignments given to do," as well

as to her deletion of the payment voucher template.  *Id.* at 29:14–30:8; *see also* Def.'s Mem. at 23 ("Mbewe . . . believed Barot had deleted payment vouchers . . . from her computer, and that this – together with Barot's refusal to do her work and her attitude toward her duties – caused Mbewe together with Mbula to place Barot on administrative leave, and also caused the Ambassador ultimately to terminate Barot.").

Plaintiff's request for a raise was based, in part, on her claim that she had saved the Embassy money by eliminating the need for a particular paper form.  There is no dispute that immediately after the request was denied, plaintiff fired off a warning to her supervisors to order more forms.  Def.'s SOF ¶ 32; Pl.'s SOF ¶ 32; Sept. 9 Barot Memo.  The memorandum suggested that she would no longer use the computerized forms that she had previously created and for which she apparently still felt she deserved financial compensation.  *See* Sept. 9 Memo; Barot Dep. at 157:12–17 ("Q: Why did you tell them that they should buy the forms . . .?  A: Because I want them to know that they are saving a lot by using what I have done and what I had formatted in my computer.  They are saving a lot.");  *id.* at 124:4–12 ("Q: So you were telling them they couldn't use your form anymore?" "A:  No.  They can still use.  But up to the time – what I was thinking is – I was thinking that maybe they would say:  Okay, we will give you your raise, so that we can – you can continue with what you are doing.  Maybe we will not buy – what will be the cost of what we will be buying we will just give it to you.").

After her supervisors received this memo, and after they came to the conclusion that plaintiff had deleted the form she had created from her computer, they placed her on administrative leave.  The letter informing plaintiff of her leave status stated:

> Further to the meeting between First Secretary (Accounts), First Secretary (Political and Administration) and yourself, regarding matters pertaining to your duties, and after serious consideration of the circumstances surrounding your actions thereafter, it has been decided to place you on

> indefinite administrative leave with immediate effect pending review of your case.

Administrative Leave Letter.  The termination letter was similar:

> I write to inform you that following the review of the circumstances that led to your being placed on administrative leave on 10th September, 2009, the Embassy has decided that your services are no longer required by the Government of the Republic of Zambia.

Termination Letter.

There is no dispute that plaintiff understood that the letters were referring to her transmission of the memorandum after the September 9 meeting.  Def.'s SOF ¶ 38 ("Barot understood the September 10 letter's reference to 'circumstances surrounding your actions thereafter' to mean the reaction of Embassy diplomatic personnel to the Barot 0-9-09 Memo."); Barot Dep. 180:3–13 ("I was thinking that they review my case, which is me having submitted the memo request for the purchase of backing sheets."); *id.* at 133:14–20 (acknowledging that her "understanding" of "circumstances surrounding your actions thereafter" was "the memo that [she] gave to Mr. Mbula for the request of the payment vouchers and backing sheets."); *id.* at 159:21–161:14 ("That the serious actions surrounding – serious action that I made after our meeting was my submission of the request for purchase of forms."); *id.* at 154:12–20 (reading from Barot day-planner entries:  "For serious action day after, which was submitting memo request for purchase of forms, backing sheets and payment vouchers. Just a proof of my claim that the Embassy saves a lot."); *id.* at 383:16–19 ("Q. So you're attributing your being kicked out of the Embassy to their reaction to your memo request? A. Yes."); *see also* Pl.'s SOF ¶ 38 ("While Ms. Barot believes that the letter is referencing her September 9, 2009 memorandum, Ms. Barot believes that the reference was a pretextual reason for placing her on administrative leave.").

The Embassy has introduced evidence that the termination was also predicated on the missing computer template. *See* Brief on the Case of Dolores Barot, at 2–3;[17] Mbewe Dep. at 30:4–31:15 ("Q. So you believe that Ms. Barot deleted payment vouchers that were programmed on her computer? A. Yes.").

This evidentiary showing shifts the burden back to plaintiff under the *McDonnell Douglas* test.

---

17      This internal memorandum, dated May 3, 2013, described the events leading to plaintiff's termination:

> At the end of the meeting our opinion was that the meeting was held in a cordial and friendly atmosphere and that we ended the meeting in mutual agreement. Later in the evening around 7:00pm, First Secretary (Accounts) Mr. Frank Mbewe informed Minister Counsellor Mr. Chioza and First Secretary (political/ Administration) Mr. Mbula that the computerized accounts payment voucher template had been deleted from the computer by Ms. Barot and that this was due to the fact that she was not happy because she had not received a salary increase and because she had not been paid her 10% bonus as she had demanded for some time. It was also learnt that she felt that the computerized payment vouchers were her intellectual property. Due to the seriousness of the allegations and the absence from station of then Ambassador Dr. Inonge Mbikusita Lewanika, a decision was made by the mission administration the same night (9th September 2009) to immediately place Ms. Barot on administrative leave (suspension) pending the arrival of the Ambassador. . . .

> Upon the Ambassador's arrival back to station, she was briefed about what had transpired during her absence and informed that the decision to suspend Ms. Barot was only an interim measure and that due to the seriousness of the alleged offence Administration had decided to recommend that ultimately her employment with the embassy had become untenable and such should be terminated. The Ambassador was in agreement and therefore went ahead and signed a letter of termination of employment dated 31st October 2009.

Brief on the Case of Dolores Barot at 2–3.

### C. Plaintiff has presented some evidence that one of the stated reasons for her termination was pretextual.

A plaintiff can demonstrate that the employer's explanation for his discharge was pretextual by providing evidence from which a reasonable jury could find that the employer's proffered, lawful reasons for acting are "unworthy of credence." *Reeves*, 530 U.S. at 143, quoting *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Showing pretext, though, "requires more than simply criticizing the employer's decisionmaking process." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014). It is not sufficient to "show that a reason given for a job action [was] not just, or fair, or sensible;" nor is it sufficient to challenge "the 'correctness or desirability' of [the] reasons offered." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996), quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994).

Courts have suggested that a plaintiff may point to "changes and inconsistencies in the stated reasons for the adverse action" as a means of showing pretext. *Brady*, 520 F.3d at 495 n.3. "[T]he employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Id.* at 495. And, a plaintiff "might also establish pretext with evidence that a factual determination underlying an adverse employment action is egregiously wrong." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

In her opposition to the summary judgment motion, plaintiff contends that there is a genuine dispute as to whether defendant's proffered reason for terminating her – namely, the "circumstances" after the September 9 meeting about her secretarial duties and request for a salary increase – was the true reason for her termination. *See* Pl.'s Opp. at 10–13. She advances two main arguments: (1) that defendant's shifting reasons for its decision to terminate her is evidence

of discrimination, and (2) that defendant's belief that she deleted the computer files was not honestly and reasonably held. *See* Pl.'s Opp. at 10–13.

### 1. Shifting Explanations for Plaintiff's Termination

Plaintiff argues that the pretextual nature of defendant's explanation can be inferred from the fact that defendant offered "shifting" explanations for her termination. *See* Pl.'s Opp. at 10–11. She points to the September 10 letter placing her on administrative leave, which states that defendant was doing so "after serious consideration of the circumstances surrounding [her] actions" after the meeting "regarding matters pertaining to [her] duties." Administrative Leave Letter. That same day, Chioza informed the Ambassador that plaintiff had been placed on administrative leave, stating that there had been "misunderstandings" with plaintiff, and that the "matters were over salary increase and failure on the part of Ms. Barot to carry out her routine work." Ex. 23. to Def.'s Mot. [Dkt. # 80-5]. The November 5, 2009 termination letter informed plaintiff that "following the review of the circumstances that led to [her] being placed on administrative leave . . . the Embassy has decided that [her] services are no longer required . . . ." Termination Letter.

Plaintiff notes that she was paid one month's salary at the time of her termination, and that she would not have been eligible for the payment under her Employment Agreement if she had been terminated for a disciplinary reason. Pl.'s Opp. at 10. She argues that all of her employer's contemporaneous statements and actions are consistent with a non-disciplinary reason for the termination, and that defendant did not "reverse course and state Ms. Barot was terminated for a disciplinary reason," that is, for deleting computer files, until during the later administrative process. *Id.* at 11.

But the language used in the 2009 documents was quite broad, and the references to the "circumstances" on September 9 fairly include both the memorandum and the deletion of the computer files. So plaintiff has not pointed to evidence of "changes or inconsistencies" in defendant's stated reasons. Moreover, while the Employment Agreement required the Embassy to give plaintiff one month's notice or one month's salary in lieu of notice if she was fired for a non-disciplinary reason, it did not bar the Embassy from doing so if she was fired for a disciplinary reason. *See* Ex. 1 to Def.'s Mot. [Dkt. # 80-3] at 5 ("Your employment may be terminated for reasons other than disciplinary action . . . . In such a case, you will be given one (1) month's notice or paid (1) month's salary in lieu of notice.").

### 2. Defendant's Honest and Reasonable Belief

Plaintiff also argues that even if defendant fired her based on the belief that she had deleted the computerized files, that belief was not honestly and reasonably held. Pl.'s Opp. at 11–12. The Court concludes that while plaintiff has not come forward with evidence that would lead a jury to conclude that her supervisors did not sincerely believe she had deleted the file, she has presented some evidence that their belief was not reasonable.

"Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183 (internal quotation marks omitted). "If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

In evaluating the employer's stated reason, the Court must assess whether the stated reason is both "honest" and "reasonable." *DeJesus*, 841 F.3d at 534.

To be clear, courts should not evaluate the reasonableness of the employer's business decisions, such as whether it made financial sense to terminate an employee who generated substantial review; we are not 'a super-personnel department that reexamines an entity's business decisions.  Rather, the factfinder is tasked with evaluating the reasonableness of the decisionmaker's *belief* because honesty and reasonableness are linked: a belief may be so unreasonable that a factfinder could suspect it was not honestly held.

*Id.*

The evidence in the record establishes that the decision-makers honestly believed that plaintiff was refusing to do her routine secretarial duties and that she had deleted the computerized forms.  After the meeting, in which plaintiff had agreed to return to her secretarial duties, plaintiff immediately informed her supervisors that the Embassy would need to purchase the paper forms that she had previously devised a computerized form to replace.  Mbewe interpreted this as a threat to refuse to use the computerized forms unless the Embassy compensated her for creating them.  And plaintiff admitted as much in her deposition.  She testified that her job as a secretary only involved paper forms, and that she wanted defendant "to know that the [computerized] one that [she] did was very useful.  They were saving, because . . . of what [she] did.  So [she] had to be compensated for what [she] did."  Barot Dep. at 123:18–124:3.  Concerned by plaintiff's reaction following the meeting, Mbewe logged on to plaintiff's computer to gain access to the electronic versions of the forms.  After he looked for the forms in their usual spot and did not find them, Mbewe concluded that plaintiff had deleted them and promptly reported his findings to his supervisor, Mbula.  Based on these circumstances, the Embassy decided to place plaintiff on administrative leave and then to terminate her.

While plaintiff has not pointed to any facts that would show that these witnesses have been dishonest about their thoughts that evening, she has come forward with some evidence that gives rise to a genuine dispute of fact concerning the reasonableness of their belief that she deleted the

form.  Mbewe testified that he and Mbula looked for the voucher file and that since they were unable to locate it, they believed plaintiff had deleted it.  But Mbewe admitted that they "never talked to her" and "never asked her" if she had deleted the voucher template, or if she had just moved the file, and they did not search the computer to ascertain whether there was a log indicating that a file had been erased.  *See* Mbewe Dep. at 49:5–15.  Meanwhile, plaintiff testified in her deposition and averred in a declaration that she did not delete the file and that she actually used the voucher template on the morning of September 10 to prepare a payment voucher for the Ambassador's car.  *See* Barot Dep. at 112:10–22; Ex. 28 to Pl.'s Opp., Aff. of Dolores Barot [Dkt. # 86-4] ("Barot Aff.") ¶ 1.  She insists that if Mbewe had just spoken to her, she "would have shown [the file] to him, as she was using the file the morning of her termination."  Pl.'s Opp. at 12.

The Court could find that these concerns relate to the quality of defendant's business judgment and decision making, which ordinarily is not a basis to find the employer's reasons to be pretextual.  But there is case law that holds that if a reasonable jury could find that there is something deficient or "fishy" about the procedure that the employer used in subjecting plaintiff to an adverse employment action, it might question whether defendant's conduct was a "reasonably objective assessment of the circumstances or, instead, an inquiry colored" by discrimination.  *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006) (holding that there was evidence from which a reasonable jury could conclude that defendant's stated reasons for terminating him were pretextual, particularly in light of record evidence that the

investigation, which was central to and culminated in plaintiff's termination, was flawed and unfair), quoting *Fischbach*, 86 F.3d at 1184.[18]

In light of that authority, the Court concludes that plaintiff has identified some grounds for a jury to question whether the supervisors' belief that she deleted the computerized voucher template was objectively reasonable, even if it was honestly held. Therefore, she has adduced some evidence that could support a finding that this aspect of the Embassy's stated non-discriminatory rationale was not an actual reason for plaintiff's termination.

But the question to be resolved at this stage is whether, based on an examination of the entire record, including the evidence relied upon to establish the prima facie case, the plaintiff has adduced sufficient evidence to enable a reasonable jury to conclude that the employer's legitimate rationale was not the actual reason, "and that the employer intentionally discriminated against the employee." *Brady*, 520 F. 3d at 494. Given the combination of reasons proffered by the employer, and the absence of any other evidence of discriminatory intent, the Court concludes that she has not.

> **D.      A reasonable juror could not find, based on this record in its entirety, that plaintiff was fired "because of" her age.**

Does the existence of facts that might lead a jury to question the adequacy of the Embassy's investigation into the missing file preclude the entry of summary judgment for defendant in this case? The D.C. Circuit has observed:

> In an appropriate case, the factfinder's disbelief of the reasons put forward by the defendant will allow it to infer intentional discrimination. Although

---

18      The D.C. Circuit has also observed that where an employer's conduct appears so "incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination," a factfinder could find pretext. *Burley*, 801 F.3d at 296. But in the *Burley* case, the court concluded that since the failure to review a videotape during the investigation would not have revealed any facts that would have affected the disciplinary action, no reasonable jury could conclude that the defendant's actions were motivated by race based on that omission alone.

> rebuttal evidence alone will not always suffice to permit an inference of discrimination, we do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.

*DeJesus*, 841 F.3d at 535 (internal citations, edits, and quotation marks omitted); *see also id.* (observing that "[t]here is no easy answer" to what additional showing of intentional discrimination a plaintiff must make to survive summary judgment once there is sufficient cause to doubt the employer's proffered reason). However, in the Court's view, this is a case where the addition of the rebuttal evidence to the rest of the record does not suffice to support an inference of discrimination.

The Supreme Court has emphasized that "although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Hicks*, 509 U.S. at 507 (emphasis in original) (internal edits omitted), quoting *Burdine*,

450 U.S. at 253.[19]  And while "a plaintiff's prima facie case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," *Reeves*, 530 U.S. at 148, the Court has cautioned: "[t]his is not to say that such a showing by the plaintiff will *always* be adequate" to establish liability.  *Id.* (emphasis in original).

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.*

---

19      In *Hicks*, the Court was addressing a situation where the Court of Appeals had called for a directed verdict after the plaintiff had rebutted the defendant's non-discriminatory reason.  The Court made it clear that merely coming forward with some evidence to undermine the defendant's claim of a reasonable basis for its action is not always enough to carry the day for the plaintiff; indeed, it devoted several pages of its opinion to dispelling the dissent's contention that its ruling could be read to stand for that principle.

> We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated*. We may, according to traditional practice, establish certain modes and orders of proof, including an initial rebuttable presumption of the sort we described earlier in this opinion, which we believe *McDonnell Douglas* represents.  But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.

509 U.S. at 514–15. (emphasis in original); *see also Aka*, 156 F.3d at 1290, 1292 (holding that even though a "plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight," it does "not automatically entitle the plaintiff to judgment as a matter of law."). While those cases arose in a different procedural posture, they underscore the necessity of a showing of discriminatory intent.

Here, plaintiff has met the bare bones requirements for a prima facie case, and she put forward a reason why a jury could question the reasonableness, if not the veracity, of one portion of the Embassy's two-pronged rationale for terminating her. But putting aside this attack on the quality of the supervisors' investigation, the record remains devoid of any evidence of discriminatory animus.

Plaintiff has pointed to no explicit statements, no sly hints, and no ambiguous remarks or circumstances that could be interpreted as a reference or a reaction to her age. There is no evidence of this sort at all. The undisputed facts are that the Embassy took no steps to discipline or to fire plaintiff until September 9, 2009, and even that day, nothing happened until after the meeting concerning plaintiff's salary – which the supervisors thought had ended amicably – was over. It was plaintiff who would not let the matter go, and it was her communication refusing to continue to utilize the computerized forms – regardless of whether or not she subsequently deleted them – that set off the chain of events that followed. Plaintiff has asserted that the concerns her supervisors have expressed were pretextual. *See* Pl.'s Opp. at 12 ("Defendant's supposed belief also immediately provokes a suspicion of pretext."); Pl.'s SOF ¶ 38 ("While Ms. Barot believes that the letter is referencing her September 9, 2009 memorandum, Ms. Barot believes that the reference was a pretextual reason for placing her on administrative leave."). But she has introduced no evidence to show that her supervisors did not honestly and reasonably believe that she had a chip on her shoulder – that she did not intend to let the salary issue go, and that she harbored continuing resentment based on her own assessment of her economic value to the

Embassy.  So one of the stated grounds for her termination has been shown to have been both honestly and reasonably believed.[20]

Under the ADEA, plaintiff must prove by a preponderance of the evidence that she would not have been fired "but for" her age.  *Gross*, 557 U.S. at 176.  Here, the record includes undisputed evidence of at least one reasonable basis for the employer's action and absolutely no evidence that age played a role beyond the circumstance that the person who was ultimately hired after plaintiff was gone was younger than she was.  Because plaintiff has not introduced sufficient evidence to carry her burden to establish discriminatory intent at the end of the day, the Court will grant summary judgment in favor of defendant on the ADEA claim.

### III.    The Court will grant defendant's motion on plaintiff's Title VII retaliation claim.[21]

Title VII protects employees from discrimination "with respect to . . . compensation" based on protected characteristics, such as an individual's sex.  42 U.S.C. § 2000e-2(a)(1).  Further, it makes it unlawful for an employer to discriminate against an employee in retaliation for opposing or reporting "any practice made an unlawful employment practice" by Title VII.    42

---

20      Plaintiff denies that she was seeking to force defendant to pay her more and states that her goal was simply to let the supervisors know that she had been useful to them.  Barot Dept. at 125:3–9 (testifying that it was "not [her] intention" to force them to buy forms or give her more money; her intention was "for them to just know that [she] ha[d] been useful also to them").  But a dispute about her motivation does not create a dispute about whether the supervisors honestly and reasonably harbored concerns.

21      Plaintiff's complaint alleges unlawful retaliation in violation of Title VII.  2d Am. Compl. ¶¶ 81–86.  She claims that she engaged in protected activity "when she complained of unequal pay and . . . of discrimination."  *Id.* ¶ 82.  In her brief, plaintiff seems to argue that she was discriminated against because she was paid less than four coworkers, "all of whom were younger than [her] . . . [or] were men."  Pl.'s Opp. at 2.  Because Title VII does not cover discrimination on the basis of age, plaintiff cannot bring a Title VII retaliation claim based on the alleged fact that she was being paid less than her younger coworkers.  Therefore, the Court will only analyze plaintiff's Title VII claim in relation to her claim that she was discriminated against based on her gender.

U.S.C. § 2000e-3(a).  To prove a Title VII retaliation claim, a plaintiff must demonstrate that "the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that she engaged in activity protected by Title VII, that she was subjected to an adverse action by her employer, and that there is a causal link between the protected activity and the adverse employment action.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  "Evaluation of Title VII retaliation claims follows the same burden-shifting template as discrimination claims."  *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006); *see also Jones*, 557 F.3d at 677–79.  Since the Court has already established that defendant has put forward a legitimate, non-retaliatory reason for terminating plaintiff, the question the Court must answer is whether plaintiff's evidence creates a material dispute on the ultimate issue of retaliation.  *See Jones*, 557 F.3d at 677–79.  At this stage, "the court reviews each of the three relevant categories of evidence – prima facie, pretext, and any other – to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation."  *Id.* at 679, quoting *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002).

The Court concludes that no reasonable jury could infer retaliation on the set of facts plaintiff has presented in this case because there is no evidence that she engaged in protected activity.  Although Title VII protects informal complaints, *see Peters v. Dist. of Columbia*, 873 F. Supp. 2d 158, 202 (D.D.C. 2012), "[n]ot every complaint garners its author protection under Title VII."  *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  And "[w]hile no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just

frustrated ambition." *Id.* (noting that the memorandum itself may not be protected activity because it did not allege "that she was currently being discriminated against").

Plaintiff maintains that the memorandum she wrote on September 7, 2009 requesting a salary increase commensurate with her secretarial duties, and the meeting she had about her request the next day with Mbewe and Mbula, constituted protected activities.[22] *See* Pl.'s Opp. at 8. But the memorandum and oral conversation fall well short of the *Broderick* standard because there is no evidence that in either complaint plaintiff alleged discrimination on the basis of gender.

In her memorandum to her supervisors, plaintiff stated that the Embassy had the "authority to give salary increase to diplomatic and locally engaged staff when one has an extra work load," and she pointed out that this was "previously done" for other employees. Sept. 7 Barot Memo. She hoped to receive a salary increase "in FAIRNESS . . . because the Embassy had become larger, and [she was] not only performing Secretarial Job, but ha[d] already been catering to a much larger volume of Accounting Job." *Id.* Nowhere in the memorandum does plaintiff mention that she is being discriminated against at all. She complained that four other employees were more highly compensated than she was, but only two out of the four she mentioned were male, so the

---

22      In her second amended complaint, plaintiff alleges that a November 10 letter she sent to the Ministry of Foreign Affairs constitutes "protected activity" for purposes of her Title VII claim. *See* 2d Am. Compl. ¶ 82; *see* Ex. 26 to Def.'s Mot. [Dkt. # 80-5] ("Nov. 10 Letter"). Defendant argues that this letter cannot form the basis of plaintiff's Title VII retaliation claim, although it does not expressly argue that it was not protected activity. *See* Def.'s Mem. at 25–27. However, the "discrimination" complained of in the letter does not refer to any protected characteristic under Title VII, but rather focuses on plaintiff's belief that she was being treated unfairly in comparison to other employees who have been subject to discipline. *See* Nov. 10 Letter ("There seems to have double standard and discrimination in the Embassy because in some cases, before a punishment is imposed to a particular staff, he/she was given a warning but in my case there was none."). And even if the letter could qualify as "protected activity," no reasonable juror could infer retaliation based on the letter. There is no evidence that the Embassy was even aware of this letter, since it was sent directly to the Ministry, and it is undisputed that it was written five days *after* defendant wrote plaintiff's termination letter.

memorandum did not include an implied suggestion, or give rise to an inference, that she was complaining about gender discrimination.

Turning to the in-person meeting, plaintiff testified in her deposition that she wrote the September 7 memorandum, and then met with Mbewe and Mbula, because she thought that she was being discriminated against because she was being treated differently from her younger and male coworkers. Barot Dep. 125:15–126:3 ("Because I was thinking that I was discriminated. Other employees, they were performing extra duties and were given extra money. And in my case, I had been doing so many things and they had even saved some money and they would not even give me an extra cent."); *id.* at 305:11–306:15 ("Q…[Y]ou previously stated that you submitted this letter because others were getting raises when getting extra duties, but you were not; correct? A. Yes."); *id.* at 307:13–19 ("Q. Were you, in sending this letter, were you describing how other employees were being treated differently than you? A. Yes."). But, whatever she was thinking, there is no evidence in the record that she discussed these other employees or any alleged gender discrimination at the meeting. It is undisputed that the meeting was about plaintiff's salary request, and that it resulted in plaintiff's agreement to return to her "position of being [a] secretary" in lieu of a raise for what she maintained was additional work. *See* Def.'s SOF ¶ 31; Pl.'s SOF ¶ 31; Barot Dep. at 107:22–108:14. Plaintiff's generalized complaint that "[o]ther employees . . . were performing extra duties and were given extra money," Barot Dep. 125:20–22, does not qualify as protected activity under Title VII.

Since plaintiff has failed to establish an essential element of a retaliation claim, no reasonable juror could find that retaliation was the "but for" cause of the adverse employment actions. Furthermore, as set forth in connection with the ADEA claim, plaintiff has failed to

undermine defendant's stated concerns about her attitude and commitment to her job. Therefore, defendant's motion for summary judgment on this count will be granted.

## CONCLUSION

Because plaintiff has not provided sufficient evidence from which a reasonable jury could conclude that she was terminated because of her age, or in retaliation for complaining about gender discrimination, the Court will grant defendant's motion for summary judgment on the remaining counts.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 8, 2018